UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/31/2025_____
```

In re the Application of:

Idalia Dominguez Ochoa, and Marcos Antonio
Aragon Leon,

                                    Petitioners,

                    v.

Wendi Ochoa Perez, Elias Sanchez Corona, Isaias
Sanchez Ochoa, Irene Trujilo Ascenio,

                                    Respondents.

24 CV 4736 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Petitioners Idalia Dominguez Ochoa (the "Mother") and Marco Antonio Aragon Leon (the "Father") (both together, the "Petitioners") brought this case against Wendi Ochoa Perez ("Wendi"), Elias Sanchez Corona ("Elias"), Isaias Sanchez Ochoa ("Isaias") and Irene Trujilo Ascenio ("Irene") (all together, the "Respondents") pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), and the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq*. ("ICARA"), seeking the immediate return of their two daughters, J.A.D. and W.Y.A.D. (both together, the "children"), who are four (4) and eleven (11) years of age, to Mexico. (ECF No. 12.)

Presently before the Court is Petitioners Petition for Return of Children. After conducting a five-day evidentiary hearing from July 21, 2025, through July 25, 2025, an *in camera* interview of J.A.D. and W.Y.A.D. on July 25, 2025, and carefully considering the record, testimony, admitted evidence, the parties' post-trial briefs, and the applicable law, the Petition for the return of J.A.D. and W.Y.A.D. is denied.

**BACKGROUND**

The following facts are taken from the First Amended Verified Petition ("FAVP" or the "Petition") and from the record and evidence offered in relation to and testimony from the evidentiary hearing conducted by the Court.

Petitioners are the parents of J.A.D. and W.Y.A.D., minor children born in Morelos, Mexico. (FAVP ¶ 2.) Respondents include Wendi, the minor children's maternal grandmother, Elias, the husband of Wendi, Isaias, the son of Wendi, and Irene. (*Id*. ¶ 3.)

Before being retained in New York, J.A.D. and W.Y.A.D. spent their entire lives in Mexico, where they were born. (*Id*. ¶ 11.) Petitioners assert that pursuant to Mexican civil law and jurisprudence they retain parental and custody rights over J.A.D. and W.Y.A.D. (*Id*. ¶ 12.) At the time of the purported wrongful retention of J.A.D. and W.Y.A.D., Petitioners were exercising their rights of custody and would have continued doing so if not for the Respondents' retention of the children. (*Id*. ¶ 13.)

Petitioners had decided as a family to move to New York, and that the best strategy for doing so was for the Father to cross the United States-Mexico Border with J.A.D. and W.Y.A.D. (*Id*. ¶ 14.) Once they successfully crossed into the United States, the Mother would immediately attempt to enter the United States herself. (*Id*.) Petitioners intended that the children would return to and reside in Mexico until the family could move together as a single unit to the United States. (*Id*.)

This effort ultimately failed, as the Father was detained for two months in a detention facility in Tuscon, Arizona. (*Id*. ¶ 15.) J.A.D. and W.Y.A.D., in the interim, were taken from Texas to Washington D.C., by the coyotes, traffickers who transport people across the Mexico border. (*Id*.) Respondents drove down from New York state to Washington D.C. to pick up the children.

(*Id.*) Meanwhile, the Father returned to Morelos, Mexico and requested that Respondents return J.A.D. and W.Y.A.D. to Mexico, but Respondents purportedly refused and to date continue to refuse to do so. (*Id.*)

Subsequent to Respondents' retention of the children, Respondents enrolled the children in school. (Respondents' Exhibits ("Resp. Ex.") VV); *see also* (Resp. Ex. KK.) Respondents also enrolled J.A.D. in psychotherapy from March 2023 to May 2024, under the care of Doctor Martha Garcia. (Resp. Ex. VV.) Throughout the course of J.A.D.'s time in psychotherapy, she consistently raised allegations of abuse against Petitioners. (*Id.*) Among other allegations, J.A.D. avers that Petitioners beat her with belts, hangers, and other objects. (*Id.*) J.A.D. reports having nightmares of being forced to return to Mexico and fervently objects to being repatriated to Mexico. (*Id.*) Likewise, she also states that she would be made to feel worthless, with Petitioners telling her that they wish they had aborted J.A.D. (*Id.*) Petitioners deny such allegations. (Evidentiary Hearing transcript ("TR") 101:14-16).

While in the United States, J.A.D. has thrived in school, receiving high-honor roll and scoring a GPA of 92. (*Id.* 624:1-3; 625:2). J.A.D. has also been instrumental in the integration of students from other countries into her classes. (*Id.* 625:12-23). J.A.D. has many friends in her school and draws with them. (*In camera* interview: TR. 20:22). J.A.D. and W.Y.A.D. also attend Church several times a week, and J.A.D. is even involved in the Church choir. (TR. 364:20-23; 365:13-14).

W.Y.A.D., like J.A.D., has developed a close bond with Respondents and does not even recognize Petitioners as her parents.  (*Id.* 683:2). J.A.D. expresses great affection for Respondents, stating that they treat J.A.D. and W.Y.A.D. as if they were Respondents own children. (*In camera* interview: TR. 8:18-21). J.A.D. stated that Respondents, unlike Petitioners, do not physically,

psychologically, or emotionally abuse her or her sister and that she feels safe with them. (*Id*. 16:3-6). J.A.D. and W.Y.A.D. similarly share a strong bond and are inseparable. (*Id*. 30:17; 31:12).

Based on the foregoing, Petitioners argue that J.A.D. and W.Y.A.D. have been wrongfully retained and ask the Court to order the immediate repatriation of J.A.D. and W.Y.A.D.; Respondents dispute that J.A.D. and W.Y.A.D. were wrongfully retained and assert that even if the children were wrongfully retained, there exists affirmative defenses to their repatriation.

## PROCEDURAL HISTORY

On July 25, 2024, Petitioners filed a First Amended Verified Petition for Return of Children to Mexico pursuant to the Hague Convention and ICARA. (ECF No. 12.) Respondents filed their motion to dismiss Petitioner's First Amended Petition, along with their memorandum of law in support on December 10, 2024 ("Mot") (ECF Nos. 29 and 30.) Petitioners filed their memorandum of law in opposition to Respondents' motion to dismiss ("Opp.") (ECF No. 31.) Finally, Respondents filed their reply memorandum of law in further support of their motion to dismiss ("Reply") (ECF No. 32.) On April 7, 2025, the Court denied Respondents' motion to dismiss Petitioners' First Amended Verified Petition. (ECF No. 36.) From July 21, 2025 through July 25, 2025, the Court conducted an evidentiary hearing as to whether to grant Petitioners' Petition for Return of Children. The Court also conducted an *in camera* interview of the children on July 25, 2025. Petitioners and Respondents filed post-trial briefing on July 30, 2025. (ECF Nos. 55 and 56.)

## LEGAL STANDARD

The Hague Convention "seeks to secure the prompt return of children wrongfully removed to or retained in any Contracting State, and to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." *Abbott v.*

*Abbott*, 560 U.S. 1, 8 (2010). The United States is a Contracting State to the Hague Convention, which has been implemented through ICARA. *Id*. at 9. The central remedy under the Hague Convention is the return of the child to his or her habitual residence. *Id*. "When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply." *Id*. (quoting Hague Convention, Arts. 4, 12.) "Any person seeking to initiate judicial proceedings under the Convention for the return of a child . . . may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action . . . ." 22 USCS § 9003(b).

> The Hague Convention provides that
>
> [t]he removal or the retention of the child is to be considered wrongful where (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Abbott*, 560 U.S. at 8 (quoting Hague Convention, art. 3). Therefore, to establish a *prima facie* case of wrongful retention under the Hague Convention, a petitioner must demonstrate by a preponderance of the evidence that

> (1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention.

*Gitter v. Gitter*, 396 F.3d 124, 130–31 (2d Cir. 2005). Once a petitioner establishes a *prima facie* case, the child must be returned to the place of habitual residence unless "one of the affirmative defenses set forth in Articles 12, 13, and 20 applies." *Cruvinel v. Cruvinel*, No. 19-CV-4237 (LDH) (SIL), 2022 WL 757955, at *5 (E.D.N.Y. Jan. 10, 2022).

**DISCUSSION**

Respondents seek dismissal of Petitioners' First Amended Verified Petition, arguing that Petitioners failed to present evidence to make out a *prima facie* case for wrongful retention and, instead, that the evidence presented during the course of the evidentiary hearing supports a finding that an affirmative defense to repatriation of the children applies and bars returning the children to Mexico. The Court will evaluate the relevant arguments in turn below.

I.      **J.A.D. and W.Y.A.D.'s Habitual Residence**

In determining a child's habitual residence, the "court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination, the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child." *Gitter*, 396 F.3d at 134. Importantly, Courts have rejected finding that a new country is a child's habitual residence where the move of children was "of a 'trial nature' and 'conditional.'" *Ermini v. Vittori*, 758 F.3d 153, 162 (2d Cir. 2014).

Here, the Court must find that Petitioners' intent was that the family unit move to the United States together, or, upon unsuccessfully attempting to enter the United States, return to Mexico as a family. Petitioner Leon specifically testified that "[i]f we couldn't be together as a family in the United States, we had to be together in Mexico all of us united." (TR. 167:19-20). According to Petitioner Leon's testimony, when Leon was detained and unsuccessful in making entry into the United States, the family's plan to remain in the United States changed and it was then to move together back to Mexico as a unit. (*Id*.). To put it otherwise, movement to the United States was of a "trial nature" and "conditional" on the family being able to move entirely together to the United States, otherwise the family would return to Mexico. *Ermini*, 758 F.3d at 162 (2d

6

Cir. 2014). This was likewise confirmed by Petitioner Dominguez's testimony who stated that the plan was for the family to return to Mexico after Petitioner Leon was released from detention. (TR. 42:14-16). Therefore, Petitioners have offered sufficient testimony and evidence that supports a finding that Mexico remains their habitual residence, satisfying the first prong of the wrongful retention analysis.

## II.    Whether Respondents' Retention Was in Breach of Petitioners' Custody Rights

Mexico's custodial laws "places a series of correlative rights and obligations on the holder of parental authority." Patricia Begne, *Parental Authority and Child Custody in Mexico,* 39 Fam. L.Q. 527, 531 (2005) (quoting Amparo Directo 2078/1974, Victor Manual Martinez Fernandez (1975)). These include "custody of the minors, the authority to raise them, discipline them, represent them in legal acts, administer their property, feed and care for them," in addition to choosing their place of domicile. *Id*. at 531, 534; *Mota* 692 F.3d 108 at 117. It follows, then, that Respondents' "retention of [J.A.D. and W.Y.A.D.] in the United States violates [Petitioners'] right[s] under Mexican law to maintain physical custody of [their] daughter[s,]" satisfying the second factor of the *Gitter* analysis. *Mota*, 692 F.3d at 117.

Clearly, then, Respondents' retention of J.A.D. and W.Y.A.D. breached Petitioners' custody rights afforded to them under Mexico's custodial law, satisfying the second prong of the wrongful retention analysis.

## III.    Whether Petitioners were Exercising their Custody Rights at the Time of Wrongful Retention

The standard for exercising custodial rights at the time of the wrongful retention is "lenient" and requires "fairly minimal activity on the part of a petitioner." *In re D.T.J.*, 956 F. Supp. 2d 523, 532–33 (S.D.N.Y. 2013) ("The standards applied to evaluating whether a petitioner

is exercising custody at the time of removal are ... lenient: They have been held to require fairly minimal activity on the part of a petitioner.")

Additionally, "[a] 'person cannot fail to exercise his custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.'" *Souratgar v. Fair*, No. 12-cv-7797 (PKC), 2012 WL 6700214, at *4 (S.D.N.Y. Dec. 26, 2012) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996)), *aff'd sub nom. Souratgar v. Lee*, 720 F.3d 96 (2d Cir. 2013). *See also Croll v. Croll*, 66 F. Supp. 2d, 554, 560 (S.D.N.Y.1999) ("Once the court determines that the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly. These matters go to the merits of the custody dispute and are, therefore, beyond the subject matter jurisdiction of the federal courts." (citation omitted))*, rev'd on other grounds,* 229 F.3d 133 (2d Cir. 2000).

Petitioners have sufficiently demonstrated that they were exercising their parental rights at the time Respondents retained J.A.D. and W.Y.A.D. First, Respondents have been unable to point to acts that "constitute clear and unequivocal abandonment" of J.A.D. and W.Y.A.D. *Souratgar*, No. 12-cv-7797 (PKC), 2012 WL 6700214, at *4. While Petitioners did relinquish J.A.D. and W.Y.A.D. to the custody of coyotes, traffickers used to transport people over the Mexico border, to transport them to United States, this was with the intention to move together as an entire family to the United States. During the evidentiary hearing, Petitioner Marco Leon testified that this effort was as part of a "[p]lan to relocate to the United States." (TR. 147:7-8; 150:5). Thus, contrary to abandoning J.A.D. and W.Y.A.D., Petitioners were attempting to move the family together in search of a better life in the United States. Whether Petitioners act of giving over physical custody of J.A.D. and W.Y.A.D. to perfect strangers might implicate whether they were negligent in their

care of the children or "exercised custody rights well or badly," that is irrelevant for the Court's wrongful retention analysis. *Croll*, 66 F. Supp. 2d at 560.

Therefore, the Court must conclude that Petitioners were exercising their rights at the time Respondents retained J.A.D. and W.Y.A.D., satisfying the third prong of the wrongful retention analysis, meaning that Petitioners have successfully stated a *prima facie* case for wrongful retention under the Hague Convention. At this point, the burden now shifts to the Respondents to establish one of the five affirmative defenses to repatriation available to Respondents. Respondents raised three affirmative defenses: mature child, well settled, and grave risk of harm. The Court addresses them in turn.

## I.    Mature Child Affirmative Defense

A court may "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." *Velozny on behalf of R.V. v. Velozny*, 550 F. Supp. 3d 4 (S.D.N.Y. 2021), *aff'd*, No. 21-1993-CV, 2021 WL 5567265, at *22 (2d Cir. Nov. 29, 2021). A relevant question for the court is whether the children are "of sufficient age . . . [and] of sufficient maturity for [their] views about return to be given weight." *Swett v. Bowe*, 733 F. Supp. 3d 225, 271 (S.D.N.Y.), *aff'd sub nom. Urquieta v. Bowe*, 120 F.4th 335 (2d Cir. 2024). Caselaw has not clearly "established objective criteria or tests assessing a child's maturity for purposes of the Hague Convention." *Id*. at 271.  Indeed, "there is no precise age at which a child will be deemed sufficiently mature under the Convention." *Id*. The child's maturity is "a question for the district court, to be determined upon the specific facts of each case." *Id*. This often is determined by the impression the child has left on the court through "testimony, demeanor, and mannerisms." *Id*.  Presently, J.A.D. objects to

being repatriated to Mexico. (*In camera* interview: TR. 15:24). The Court must now decide whether she is old enough and mature enough for her views to be taken into consideration.

In *Bowe*, the court concluded that the child, S.B.S. who, at the time of the case "was two months shy of age 12," was of sufficient age and maturity for his views to be given credence about repatriation. *Bowe,* 733 F. Supp. 3d 225 at 271. In justifying its reasoning, the court pointed to, among other aspects: 1) S.B.S. "present[ing] as thoughtful, intelligent, poised, and direct. Based on his answers and demeanor, S.B.S. conveyed that he appreciated the solemnity of the occasion, the need for care, and the imperative of telling the truth"; 2) S.B.S. "coherently articulated his objections to returning to Chile and his reasons to want to remain in the United States." *Id*. at 271.

J.A.D. easily parallels S.B.S. in *Bowe*. Testimony from both Petitioners and Respondents clearly underscore J.A.D.'s maturity, insight, intelligence, and strength. *See* Petitioners' expert Peralta acknowledging J.A.D.'s intelligence at TR. 686:10; *see also* Respondents' expert Doctor Garcia acknowledging J.A.D. being exceptionally intelligent at TR. 476:17. During the *in camera* interview of J.A.D., the Court, who had ample opportunity to observe J.A.D., determined that J.A.D. was able to distinguish between right from wrong, and truth from fiction. Furthermore, during the interview, it was apparent that J.A.D. was remarkably bright, speaking to her favorite courses in school, her love for her sister, and her dreams of being either a doctor or a veterinarian. (*In camera* interview: TR. 3:5; 21:18-21; 31:12).  Like S.B.S., J.A.D. is just a few months shy of her 12th birthday. Like S.B.S., J.A.D. "coherently articulated [her] objections to [Mexico] and [her] reasons to want to remain in the United States . . . [her] reasoning [was] sensible, well-analyzed, and grounded in experience." *Bowe,* 733 F. Supp. 3d 225 at 272.

Importantly, the views of J.A.D. were characterized by "constancy and coherence . . . underscor[ing] that these are not passing fan[tasy's]." *Id*. During her *in camera* interview, J.A.D.

expressed an unwillingness to visit Petitioners in Mexico unless she had "protection" and reiterated that she experienced physical and emotional abuse while living in Mexico. (*In camera interview:* TR. 25:9, 28:15-17). Such allegations were long-standing and their veracity bolstered by more than a year of J.A.D.'s medical records from her therapy sessions with Dr. Martha Garcia. Like J.A.D.'s testimony offered during the *in camera* interview, Dr. Garcia's psychotherapy notes demonstrated that J.A.D. had a persistent, long-standing fear of returning to Mexico and a consistent narrative wherein she asserted she experienced physical and emotional abuse at the hands of Petitioners. *See* (Resp. Ex. VV). Specifically, at some time in 2022, Doctor Garcia spoke at a public forum "Know-Your-Rights" training, where topics such as familial or domestic violence were discussed. (TR. 407:19). At the close of the training, J.A.D. asked Doctor Garcia whether Doctor Garcia could help her as she experienced the kind of domestic violence discussed during the training. (*Id*. 409:10-11). Thereafter, Doctor Garcia provided psychotherapy to J.A.D. for over a year, from March 2023 through May 15, 2024. During that time, according to Doctor Garcia's notes of the therapy sessions, J.A.D. consistently brought up, on her own accord, that she was abused in Mexico, that she was afraid of being returned to Mexico, and that she was happy living with Respondents. *See* (Resp. Ex. VV). Clearly, far before the instant proceedings, J.A.D. was articulating her experiences in Mexico in a manner consistent with the clear and coherent testimony J.A.D. offered the Court during her *in camera* interview, favoring a finding that J.A.D. is mature enough for her views to be taken into account when deciding whether to repatriate her.

Petitioners attempt to argue that J.A.D.'s objections to returning to Mexico are products of narrative contamination by Respondents. The Court does not find such argument persuasive, as the record fails to offer any credible objective evidence to support such a claim. Assuming, *arguendo*, Respondents did influence J.A.D.'s narrative, there is ample caselaw that so long as

J.A.D.'s expressed views were long-standing and reasoned, the Court can credit her testimony, meaning the Court can credit her opposition to repatriation. *Blondin v. Dubois*, 78 F. Supp. 2d 283, 296 (S.D.N.Y. 2000), *aff'd*, 238 F.3d 153 (2d Cir. 2001) (although child might have been coached by mother to some degree, her objection to being returned was not the product of mother's "undue influence"); *see also Swett v. Bowe,* 733 F. Supp. 3d 225 (S.D.N.Y.), *aff'd sub nom. Urquieta v. Bowe*, 120 F.4th 335 (2d Cir. 2024) (noting possibility of undue influence on child but finding that such a possibility did not describe the child where their expressed views were "independent and longstanding"). J.A.D. repeatedly said over the course of almost a year and a half in psychotherapy, far before the instant proceedings were commenced, that she was physically and emotionally abused by Petitioners. (*See* Resp. Ex. VV). During the *in camera* interview, J.A.D. coherently and thoughtfully articulated the physical and emotional abuse she experienced in Mexico and how such abuse was entirely absent in her life in the United States. (*In camera* interview: TR. 28:11-21). Thus, while it is possible that Respondents may have influenced, to some degree, J.A.D.'s narrative of her experiences, J.A.D.'s testimony that she did not want to return to Mexico for fear of possible continued abuse and retribution was well-reasoned, consistent over a significantly long period of time, and, as a result, the Court finds that her testimony is of the maturity that allows the Court to give weight to her objection to being repatriated to Mexico.

Therefore, considering the Court has found J.A.D. is of a sufficient age and maturity where it is reasonable to take into consideration her objections to repatriation, and considering J.A.D.'s long-standing, consistently articulated objections to returning to Mexico, the Court finds that Respondents have successfully raised and established by clear and convincing evidence the age and maturity affirmative defense against Petitioners' Petition for repatriation of J.A.D.

## II.        Well Settled Affirmative Defense

The Convention does not "define 'settled' or state how this defense is to be proved, but the burden falls upon the party opposing the return of the child to establish the defense." *In re Lozano*, 809 F. Supp. 2d 197, 225 (S.D.N.Y. 2011). However, caselaw is clear that "'nothing less than substantial evidence of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof.'" *Id*. at 226 (quoting State Dep't Legal Analysis § III(I)(1)(c), 51 Fed. Reg. at 10,509). The Court is also to consider "evidence concerning the child's contacts with and other ties to her State of habitual residence." *Id*.

"Among the facts considered by the courts in determining whether a child is settled in her new environment are the age of the child, the stability of the child's residence in the new environment, whether the child attends school or day care consistently, whether the child attends church regularly, the stability of the [respondent's] employment, and whether the child has friends and relatives in the new area." *In re Koc*, 181 F. Supp. 2d 136, 152 (E.D.N.Y. 2001), *report and recommendation adopted* (Apr. 3, 2001). The Second Circuit has stressed that a "'more comfortable material existence' does not mean that the child is well settled." *Id.*

J.A.D. is the epitome of a well settled child the Hague Convention is concerned with. According to Respondents' testimony, she attends Church three times a week and even participates in the Church choir. (TR. 364:20-23; 365:13-14); *see also* (Resp. Ex. II). Based on the testimony of Ms. Latoya Lewis, a guidance counselor at J.A.D.'s school, J.A.D. has impressively adjusted to and excelled in school in the United States: her school attendance record is 95 percent (*Id*. 625:2-3); she has consistently been awarded high honor roll (*Id*. 624:1-3); her GPA for the entire school year was a 92 (*Id*. 625:2); she has been recognized at school town meetings for her academic achievements and being an exemplary student (*Id*. 626:9) and, due to her academic success she

13

was recommended for an accelerated growing program allowing her to graduate out of her bilingual classroom. (*Id*. 625:5). J.A.D.'s involvement in the school community is in depth and noteworthy for a student in middle school – she is involved in the drama program (*Id*. 627:8), and goes as far as to help school staff interact with students who have limited English proficiency by serving as a peer mentor and interpret for the school staff when interacting with said students. (*Id*. 625:12-23). Such evidence of academic excellence and community involvement is bolstered by J.A.D.'s own school records. (Resp. Ex. KK).

J.A.D. also has many friends at school. (*In camera* interview: TR. 16-17). She spends time with them and draws together when they have free time, drawing flowers. (*In camera* interview: TR. 20-22). In terms of stability of Respondents' employment, Petitioners' expert Peralta acknowledged that J.A.D. and W.Y.A.D. were financially secure in the care of Respondents. (TR. 664:16). J.A.D.'s testimony in the *in camera* interview offers a depiction of Respondents' home as a stable, loving home; J.A.D. states she likes living with Respondents because they hug her and "takes care of [them] like [they] were her own children." (*In camera* interview: TR. 8:18-21). Respondents take J.A.D. and W.Y.A.D to the playgrounds and to places such as FunMax, a trampoline park. (*In camera* interview: TR. 10:14-15); *see also* (Resp. Exs. EE and FF). Respondents also read J.A.D. and W.Y.A.D. stories the children enjoy. (*In camera* interview: TR. 10:23-25). Therefore, taken together evidence offered regarding J.A.D.'s life in the United States and the factors articulated *supra*, the Court must find that J.A.D. is well settled in the United States and that Respondents have successfully established by clear and convincing evidence said affirmative defense against repatriation of J.A.D.

It might be argued that W.Y.A.D.'s young age precludes a finding that she, too, is well settled in the United States; however, "courts are not in total agreement as to the existence of a

correlation between age and degree of settlement." *Broca v. Giron*, No. 11 CV 5818 SJ JMA, 2013 WL 867276 (E.D.N.Y. Mar. 7, 2013), *aff'd*, 530 F. App'x 46 (2d Cir. 2013). It "cannot be said that an older child is either less settled or more settled than a younger child." *Id*. W.Y.A.D. has spent the overwhelming majority of her life in the United States and has "established bonds here," namely the very close bond she shares with J.A.D and Respondents. (*In camera* interview: TR. 31:12); *see also* (*See* Resp. Exs. FF, JJ).  During the *in camera* interview, W.Y.A.D. presented as a very jubilant child, constantly looking for the attention of J.A.D. and showing J.A.D. what she was exploring. The evidence further demonstrates that W.Y.A.D. has lived the majority of her life in the United States, has a strong sibling bond with J.A.D., and appears to have developed a child-parent relationship with Respondent Wendi; such dynamics evidence that W.Y.A.D. is well settled in the United States. Moreover, W.Y.A.D., according to Petitioners' own expert Peralta, does not even recognize Petitioners as her own parents, cutting against the idea that W.Y.A.D. has established bonds in Mexico that would counsel against finding that she is well settled in the United States. (TR. 683:2). Accordingly, the Court finds that Respondents have successfully raised the well settled affirmative defense to Petitioners' Petition for repatriation of J.A.D. and W.Y.A.D.

### III.    Grave Risk of Harm Affirmative Defense

A "respondent arguing that return would expose the child to a grave risk of harm must establish that this exception applies by 'clear and convincing evidence.' Absent a finding that an exception applies, a child determined to be wrongfully removed or retained must be 'promptly returned' to the country of habitual residence." *Id*. at 672. (what is this citing to?)

"The level of risk and danger required to trigger this exception has consistently been held to be very high." *Norden–Powers v. Beveridge,* 125 F. Supp. 2d 634, 640 (E.D.N.Y. 2000). The Second Circuit has stressed that a "grave risk" of harm "does not exist when repatriation 'might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not

comport with the child's preferences." *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014). A grave risk of harm "exists when repatriation would make the child 'face[] a real risk of being hurt, physically or psychologically.' The potential harm 'must be severe,' and there must be a probability that the harm will materialize.'" *Id*.

In *Ermini*, the Second Circuit found that, by clear and convincing evidence, the children faced a "grave risk" of harm because of Ermini's physical abuse. *Id*. at 165. Specifically, the Second Circuit noted that the children "testified to being fearful of his father on the basis of [] physical and verbal abuse" and that Ermini was "in the habit" of hitting the children. *Id*. The hitting was neither "[s]poradic or isolated." *Id*. The Second Circuit thus concluded that if the children were to be returned to Ermini, they faced a "grave risk" of harm that would likely materialize and affirmed the district court's denial of the petitioner's petition.

Courts have denied repatriation after finding that "the petitioning parent had actually abused, threatened to abuse, or inspired fear in the children in question." *Souratgar v. Lee*, 720 F.3d 96 (2d Cir. 2013). At the same time, *Souratgar* did hold that "[s]poradic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found to constitute a grave risk." *Id*. at 104.

"[I]nferior economic and educational opportunities [do not] rise to the level of [] harm" anticipated by the grave risk defense. *In re Koc*, 181 F. Supp. 2d F at 155. In other words, poor living conditions do not necessarily constitute evidence establishing a grave risk of harm. Federal courts across the country have cautioned using a child's standard of living as evidence tending to establish the existence of a grave risk of harm, otherwise "parents in more developed countries would have unchecked power to abduct children from countries with a lower standard of living." *Cuellar v. Joyce*, 596 F.3d 505, 509 (9th Cir. 2010). Thus, if a court is going to deny repatriation

16

on account of standard of living, there should be more than just a disparity in material conditions of a child's living situation in the wrongfully retained country and the country of habitual residence.

The Court finds that J.A.D. faces a grave risk of harm if she were to be repatriated to Mexico. At the outset, the Court clarifies that this is not based on "inferior economic and educational opportunities," as disparities in material realities do not constitute harm that falls within the ambit of the grave risk defense. *In re Koc*, 181 F. Supp. 2d at 155. Rather, the basis of the Court's finding is ample evidence furnished that points to habitual physical, psychological and emotional abuse against J.A.D. and that, were she to return to Mexico, there would be a grave risk that it would likely materialize subjecting her to further abuse.

The evidence from the instant action parallels the facts before the Second Circuit in *Ermini*. In *Ermini*, as discussed *supra*, the Second Circuit affirmed the denial of a petition for repatriation where the Second Circuit found that there was evidence that the subject child was fearful of his parents and that his parents habitually abused him physically and emotionally. *Ermini*, 758 F.3d at 165. Rather than isolated, sporadic discipline, Ermini expressed anger towards the children verbally and physically. *Id*. The Second Circuit found that such abuse was sufficient for Respondents to invoke the grave risk of harm defense.

J.A.D. reflects the same experiences of the child in *Ermini*. In addition to being physically abused, J.A.D. recounted being verbally abused by Petitioners and being left to feel of less value than her siblings. (Resp. Ex. VV). J.A.D. is fearful of Petitioners, would prefer not to return to Mexico, and would only return to visit Mexico if she had "protection" and was not left alone with Petitioners. (*In camera* interview: TR. 25:4-14). She testified that she was hit many times with belts, hangers, and other objects that Petitioners would find at their disposal and distinguished such

corporal punishment from mere "pats" on her bottom. (*In camera* interview: TR. 17:13-25); *see also* (Resp. Ex. VV). While Petitioners deny that they ever abused J.A.D., Petitioners expert Peralta acknowledged there was a credible history of trauma in her assessment of J.A.D. (TR. 694:12). Moreover, emotionally and psychologically J.A.D. was treated in such a way that she did not feel loved nor wanted, and that it was noteworthy for her that Respondents gave her hugs and expressed affection for her and W.Y.A.D. (*In camera* interview: TR. 9:8). The treatment records, over the course of over a year, clearly reflects J.A.D.'s experiences that she was physically and emotionally abused constantly and that she was so fearful of returning to Mexico that she would have nightmares. (*See* Resp. Ex. VV).

Petitioners, beyond denying that they physically or emotionally abused J.A.D., offered no evidence that would assure the Court that if the children were repatriated, J.A.D. would not be subject to future abuse and trauma of the kind reflected in the record. Moreover, Petitioners did not offer ameliorative measures in response to Respondents' grave risk of harm argument and the Court "has no obligation under the Convention to consider ameliorative measures that have not been raised by the parties." *Golan v. Saada*, 596 U.S. 666, 678 (2022), *judgment entered*, 213 L. Ed. 2d 1107 (June 29, 2022).[1]

Therefore, the Court must find that Respondents have carried their burden to demonstrate that if J.A.D. were to be repatriated, she would face more than a risk of inconvenience or change

---

[1] Petitioners fashion a brief discussion on ameliorative measures for the first time throughout the entirety of the instant action in their post-trial brief. *See* (Petitioners' Post-Trial Brief pp. 21-22). However, the Supreme Court in *Golan* clearly articulated a relationship between the grave risk of harm analysis and the possibility of ameliorative measures. *See Golan*, 596 U.S. 666 at 677-78. The relevance of the ameliorative measures turns on whether the measures can abate the finding of a grave risk of harm. Petitioners' 1) failed to raise the ameliorative measures argument during the course of the hearing after Respondents presented their grave risk of harm analysis and 2) do not address how their proposed ameliorative measures would mitigate the grave risk of harm the children face were they to be repatriated. Instead, Petitioners' post-trial brief only discusses in two short paragraphs how the children can be reintroduced to their parents. (Petitioners' Post-Trial Brief pp. 21-22). Therefore, the Court finds that Petitioners have not offered any reasoning for the Court to find that the grave risk of harm the children face were they to be returned to Mexico could be mitigated by ameliorative measures and rejects Petitioners' arguments to that end.

in educational opportunities – she would face a strong probability that she will be subject to physical, psychological and emotional abuse, as needed to state the grave risk of harm affirmative defense. *Souratgar,* 720 F.3d at 105. *See also Elyashiv v. Elyashiv,* 353 F. Supp. 2d 394, 408–09 (E.D.N.Y. 2005) (denying repatriation because the petitioner had physically abused the respondent and the children and had repeatedly threatened the respondent and her family since the respondent came to the United States, and there was uncontroverted expert testimony that the children would suffer relapse of their PTSD symptoms by merely returning to Israel, even if they had no contact with the petitioner); *Reyes Olguin v. Cruz Santana,* No. 03–CV–6299, 2005 WL 67094, at *2–4, *11–12 (E.D.N.Y. Jan. 13, 2005) (denying petition to order return of children to Mexico because the record showed that the petitioner frequently and viciously beat the respondent in front of the children, the children told a psychiatrist that their father hit them as well, and there was uncontroverted expert testimony that a return to Mexico would exacerbate the PTSD suffered by the older child).

Additionally, that W.Y.A.D. might have escaped the effects of the physical and psychological abuse perpetrated by Petitioners on J.A.D. is of no moment; while W.Y.A.D., "presumably due to her young age, appears to have largely escaped the physical and psychological injuries suffered by her older sibling[], nothing in the Convention requires that a child must first be traumatized by abuse before the Article 13(b) exception applies. *Galaviz*, 95 F.4th at 260 (quoting *Simcox v. Simcox*, 511 F.3d 594, 609 (6th Cir. 2007)).

Consequently, the Court must find that Respondents have successfully established the grave risk of harm defense against the Petition for the return of J.A.D. and W.Y.A.D.

**IV.    J.A.D.'s Affirmative Defenses Forecloses Repatriation of W.Y.A.D.**

While the Court has concluded that as to W.Y.A.D. Respondents have successfully raised the Well Settled Affirmative Defense, the Court notes that even if it did not reach such a conclusion, the Court would still decide against W.Y.A.D.'s repatriation given how paramount the sibling relationship is in Hague Convention proceedings. Courts "have hesitated to separate siblings." *Taveras v. Morales*, 22 F. Supp. 3d 219, 239 (S.D.N.Y. 2014), *aff'd sub nom. Taveras ex rel. L.A.H. v. Morales*, 604 F. App'x 55 (2d Cir. 2015). "Other district courts in this Circuit have declined to separate siblings where the grave risk defense was satisfied as to one child but not the other, acknowledging the grave psychological harm that could result from the separation of siblings." *Kosewski v. Michalowska*, No. 15-CV-928 KAM VVP, 2015 WL 5999389, at *17 (E.D.N.Y. Oct. 14, 2015).

Indeed, courts have found "that the sibling relationship should be protected even if only one of the children can properly raise an affirmative defense under the Hague Convention." *Ermini v. Vittori,* No. 12 CIV. 6100 LTS, 2013 WL 1703590 (S.D.N.Y. Apr. 19, 2013), *aff'd as amended*, 758 F.3d 153 (2d Cir. 2014). *See also Broca v. Giron,* No. 11 CV 5818(SJ)(JMA), 2013 WL 867276, at *9 (E.D.N.Y. Mar. 7, 2013) (deciding not to "further fracture the family unit" and separate the siblings). "The Court recognizes that, often, it is harmful for young siblings to separate from one another." *Raijmakers-Eghaghe v. Haro*, 131 F. Supp. 2d 953, 958 (E.D. Mich. 2001). Separating siblings who are bonded is tantamount to "cruel treatment." *Leonard v. Lentz*, 297 F. Supp. 3d 874, 897 (N.D. Iowa 2017).

As discussed *supra*, the Court has found that Respondents have successfully stated affirmative defenses of well settled, grave risk of harm, and mature child as it relates to J.A.D., and well settled as it relates to W.Y.A.D. Therefore, there are affirmative defenses to repatriation

of both children; however, even if the Court could not find an affirmative defense applicable to W.Y.A.D., her repatriation would still be foreclosed by the Court's finding that affirmative defenses apply to J.A.D.

The Court reiterates the premium courts in the Second Circuit have given to sibling bonds and ensuring they are not fractured during Hague Convention proceedings. The deep bond between J.A.D. and W.Y.A.D. was entirely clear during the *in camera* interview of J.A.D. and W.Y.A.D. (*See* Resp. Ex. JJ). Throughout the interview, J.A.D. was notably attentive to and watchful of W.Y.A.D. Throughout the entirety of the conversation, wherever W.Y.A.D. would move to, J.A.D. would follow W.Y.A.D., looking to ensure her sister's safety and wellbeing. Notably, W.Y.A.D. would constantly look for J.A.D. and show J.A.D. toys that she was playing with. J.A.D. even testified that her bond with her sister was strong, that they sleep in the same room, and that it is important for her that they be together. (*In camera* interview: TR. 30:17; 31:12). Notably, it was J.A.D., still a child at the time, who cared for W.Y.A.D. during their journey with perfect strangers from the Mexico border to Washington, D.C. Therefore, recognizing the significance of protecting the bond between J.A.D. and W.Y.A.D., that Respondents have effectively raised affirmative defenses counsel against repatriation of both children, the Court denies Petitioners' First Amended Verified Petition seeking the return of J.A.D. and W.Y.A.D.

## CONCLUSION

For the foregoing reasons, Petitioners Idalia Dominguez Ochoa and Marco Antonio Aragon Leon's First Amended Verified Petition for the return of J.A.D. and W.Y.A.D. under the Hague Convention is DENIED with prejudice.[2] The Petition is dismissed, and each party shall bear their

---

[2] *See Ermini v. Vittori*, 758 F.3d 153 (2d Cir. 2014) (holding that the Hague Convention does not permit denial of return of children petitions without prejudice).

own costs. The Clerk of Court is respectfully directed to enter judgment in favor of Respondents, and to terminate the instant action and close this case.

Dated: July 31, 2025                                    SO ORDERED:
White Plains, New York

_____

NELSON S. ROMÁN

United States District Judge